IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MAURICE ADRIAN WILKINS,

        Plaintiff,

v.

BERKS COUNTY JAIL SYSTEM, et al.

        Defendants.

CIVIL ACTION
NO. 15-5448

**OPINION**

**Slomsky, J.**                                                                                                         June 13, 2017

## I.    INTRODUCTION

Plaintiff Maurice Adrian Wilkins brings this action pursuant to 42 U.S.C. § 1983 alleging violations of his civil rights arising out of two prison assaults he endured while incarcerated at Berks County Jail System ("Berks County Jail"). (Doc. No. 33.) The Defendants are Warden Janine Quigley, Captain Torres, Correctional Officer Fink, and Correctional Officer Riegner.[1] (Id.)

## II.    BACKGROUND

Sometime in the summer of 2015, Plaintiff Maurice Adrian Wilkins, an inmate at the State Correctional Institution in Huntingdon, Pennsylvania ("SCI Huntingdon"), was transferred to Berks County Jail while awaiting trial. (Id. at ¶ 8.) During his time at Berks County Jail,

---

[1] Plaintiff originally instituted this action naming Berks County Jail System ("Berks County Jail") as a Defendant. (Doc. No. 1.) However, on October 8, 2015, pursuant to 28 U.S.C. § 1915(e), this Court dismissed Berks County Jail as a Defendant, because Berks County Jail is not a "person" subject to suit under 42 U.S.C. § 1983. (See Doc. No. 2 citing Mitchell v. Chester Cty. Farms Prison, 426 F. Supp. 271 (E.D. Pa. 1976).)

there was confusion regarding where Plaintiff should be housed and when he should return to SCI Huntingdon. (Id. at ¶¶ 8, 10-11.)

Most inmates are housed in the general population of Berks County Jail, which is divided into cell blocks. One correctional officer is stationed at the end of each cell block, and is responsible for the approximately 90 inmates held there. (Id. at ¶ 14.) This officer remotely controls the opening and closing of each inmate's jail cell door from a station located on the cell block. (Id. at ¶ 13.)

For those unsuited for the general population, Berks County Jail maintains a system for "administrative separation" or "protective custody" in which those who are faced with threats from fellow inmates may be separated from the general population of the jail and housed in safe quarters without the threat of physical violence. (Id. at ¶ 9.) In addition, Berks County Jail uses alternative measures, such as single-occupancy cell housing, to ensure that inmates are free from abuse from other prisoners. (Id.)

On August 14, 2015, officials from SCI Huntingdon sent an information sheet to officials at Berks County Jail, recommending that Wilkins be placed at "custody level 5," which is a custody level reserved for inmates who should be removed from the general jail population and placed in separate housing. (Id.) Nonetheless, Plaintiff was placed in "Cell Block J," in the general population of the jail. (Id. at ¶ 10.) By August 19, 2015, Plaintiff's trial concluded and he was eligible for transfer out of Berks County Jail and back to SCI Huntingdon. (Id. at ¶ 11.) Plaintiff, however, was not immediately transferred. (Id. at ¶¶ 11-12.) On August 24, 2015, Plaintiff notified officials at Berks County Jail that he was finished with his court appearances until November, and asked to be transferred back to SCI Huntingdon. (Id. at ¶ 12.) "Plaintiff

was told that the sheriffs had to be notified by the Court, not the jail, and that once they received instructions from the Court he would be transferred out of Berks County [Jail]." (Id.)

The following day, Plaintiff returned from a medical clinic in Berks County Jail to Cell Block J. (Id. at ¶ 16.) Plaintiff stood outside of his cell unprotected, waiting to receive the attention of Correctional Officer Fink, who at the time was the officer responsible for guarding Cell Block J. (Id.) Correctional Officer Fink was stationed at the end of the cell block and controlled the cell doors from his station. (Id.) However, he appeared to be talking to several other inmates and did not notice Plaintiff. (Id.)

While waiting for Correctional Officer Fink to take notice, another inmate told Wilkins to "watch out" because a relative of an alleged victim in Plaintiff's criminal case intended to harm him. (Id.) Wilkins started to move away to avoid being exposed to attack, but inadvertently dropped his identification badge. (Id.) As he bent over to retrieve the badge, a fellow inmate named Thomas Alequin punched him in the face. (Id.) Plaintiff took several steps back in order to avoid contact and to garner the attention of Correctional Officer Fink, who was still some distance away. (Id.) Alequin continued to assault Plaintiff. (Id.) As the attack occurred, Alequin made repeated references to his brother, the alleged victim of the crime for which Plaintiff was awaiting trial. (Id.) In all, it took Correctional Officer Fink several minutes to respond to the altercation. (Id.) Once he noticed the confrontation, Correctional Officer Fink called for reinforcement to restrain Alequin and told Plaintiff to lie on the floor. (Id. at ¶ 17.) Plaintiff was later punished for the incident and placed in solitary confinement for a number of days. (Id. at Ex. G.)

Plaintiff repeatedly requested to speak to Captain Torres, the officer in charge, but was denied this opportunity. (Id. at ¶ 17.) Plaintiff filed grievances and attended a disciplinary

hearing to challenge his punishment for his involvement in the assault. (Id. at ¶ 18.) Although his challenge was unsuccessful in the disciplinary hearing, Warden Quigley responded to Plaintiff's appeal by commending him for "not responding to violence with violence," and reducing his punishment. (Id. at Ex. G.) Plaintiff again inquired about being transferred back to SCI Huntingdon because he had completed his court appearances, yet he remained confined at Berks County Jail. (Id. at ¶ 19.)

On September 9, 2015, less than 24 hours after Plaintiff returned from solitary confinement to the general jail population, inmate Williams Valentin-Quinones rushed into Plaintiff's open cell and assaulted him. (Id. at ¶ 20.) Valentin-Quinones is a cousin of the victim of the crime for which Plaintiff had been on trial. (Id. at ¶ 21.) Another inmate named Rafael Figueroa-Rodriquez joined in and began striking Plaintiff. (Id. at ¶ 20.) During the assault, Correctional Officer Riegner was on duty in Plaintiff's cell block, but was distracted by other inmates entering the cell block after spending time in the exercise yard and did not notice the inmates enter Plaintiff's cell. (Id.) Only when another officer entered the cell block was he made aware of the ongoing attack. (Id.) Officers were called into the room to secure Valentin-Quinones, Figueroa-Rodriquez, and Plaintiff. (Id.) During this response, Plaintiff was shocked with a Taser and handcuffed. (Id.) Plaintiff was then taken away for medical treatment.

Plaintiff again filed grievances about the second assault. Captain Torres responded to one grievance, stating that officials were not aware that Valentin-Quinones is related to the victim of the crime for which Plaintiff was on trial. (Id. at Exs. J, M.) Warden Quigley also responded to Plaintiff's grievances and reduced his punishment. (Id. at Ex. H.) Thereafter, Plaintiff was separated from the general population by being placed in administrative custody. (Id.)

On October 2, 2015, Plaintiff, proceeding pro se, initiated this action against Defendants. (Doc. No. 1.) Plaintiff then filed an Amended Complaint. (Doc. No. 4.) On January 12, 2016, with leave of the Court, Plaintiff filed a Second Amended Complaint. (Doc. No. 15.) Following a hearing on January 28, 2016, the Court referred this case to the Eastern District of Pennsylvania's Civil Rights Panel for the appointment of counsel. (Doc. No. 20.) After retaining counsel, Plaintiff filed a counseled Third Amended Complaint ("TAC"), which is the operative pleading in this case. (Doc. No. 33.) On November 11, 2016, Defendant Warden Quigley filed an Answer to the TAC. (Doc. No. 34.) That same day, Defendants Captain Torres, Correctional Officer Fink, and Correctional Officer Riegner (collectively referred to as "Moving Defendants") filed a Motion to Dismiss the TAC. (Doc. No. 35.) On December 5, 2016, Plaintiff filed a Response in Opposition. (Doc. No. 36.) The Motion to Dismiss is now ripe for a decision.[2]

## III. STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009). After Iqbal it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 663; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, 231 n.14 (3d Cir. 2013) (citing Sheridan v. NGK Metals Corp., 609 F.3d 239, 262 n.27 (3d Cir. 2010)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

---

[2] In reaching a decision, the Court has considered the TAC (Doc. No. 33), the Motion to Dismiss the TAC (Doc. No. 35), and Plaintiff's Response in Opposition (Doc. No. 36).

5

liable for the misconduct alleged." Id. Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Twp., 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679). "This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (citing Phillips v. Cty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'shown' — 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679. The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

## IV. ANALYSIS

Plaintiff's Third Amended Complaint ("TAC") raises one claim against Captain Torres, Correctional Officer Fink, and Correctional Officer Riegner (collectively referred to as "Moving

Defendants") pursuant to 42 U.S.C. § 1983 (commonly referred to as "Section 1983").[3] In Count I, he alleges that Moving Defendants' failure to protect him from violence at the hands of other inmates resulted in a violation of his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right to personal bodily integrity.[4] (Doc. No. 33 at ¶¶ 27-33.)

A plaintiff raising a claim under Section 1983 must allege a violation of a right secured by the Constitution or the laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. West v. Adkins, 487 U.S. 42, 48 (1988). Prison officials have "a duty to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994). To state a claim for damages against a prison official for failure to protect from inmate violence, an inmate must plead facts that show: "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm." Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012) (citations omitted). Deliberate indifference is a subjective standard. Id. The prison official "must actually have known or been aware of the excessive risk to inmate safety." Beers-

---

[3] The TAC raises two claims: (1) a Section 1983 failure to protect claim against all Defendants, and (2) a Monell failure to train claim asserting supervisory liability against Warden Quigley. (Doc. No. 33 at ¶¶ 27-39.) The second claim against Warden Quigley individually will not be addressed here because she has filed an Answer to the TAC. (See Doc. No. 34.)

[4] The Eighth Amendment protection from cruel and unusual punishment applies to convicted prisoners, whereas the Fourteenth Amendment right to personal bodily integrity protects pretrial detainees who are in custody but have not yet been convicted of a crime. Boring v. Kozakiewicz, 833 F.2d 468, 471 (3d Cir. 1987). It is well-settled that pretrial detainees are entitled to as much protection as convicted prisoners. Hubbard v. Taylor, 399 F.3d 150, 165 (3d Cir. 2005). In fact, the Third Circuit has consistently held that when proceeding under the Fourteenth Amendment, the Eighth Amendment serves as a useful analogy. See, e.g., Boring, 833 F.2d at 471-72. Thus, since Plaintiff is proceeding under the Eighth and Fourteenth Amendments for his failure to protect claim, the analysis is similar.

Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001). "A plaintiff can, however, prove an official's actual knowledge of substantial risk to his safety 'in the usual ways, including inference from circumstantial evidence.'" Bistrian, 696 F.3d at 367 (quoting Farmer, 511 U.S. at 842). In fact, courts regularly find that a defendant's knowledge of a serious risk to an inmate's safety may be established by circumstantial evidence. See, e.g., Bland v. Lewis, No. 14-1892, 2016 WL 3762707, at *2 (E.D. Pa. July 13, 2016) (denying the defendants' motion for summary judgment and concluding that the lack of direct evidence did not foreclose the defendants' actual knowledge of the danger to the plaintiff's safety).

Here, Plaintiff alleges violations of two clearly established constitutional rights by prison officials acting under color of state law. (Doc. No. 33 at ¶¶ 27-33.) He alleges that his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right to personal bodily integrity were violated when officials at Berks County Jail failed to protect him from violence at the hands of other inmates. (Id.)

Moving Defendants contend that Plaintiff has failed to plead facts showing that they acted with deliberate indifference. (Doc. No. 35-1 at 10.) The TAC, however, suggests through direct and circumstantial evidence that Moving Defendants were "aware of the excessive risk" to Plaintiff's safety. Beers-Capitol, 256 F.3d at 125.

With respect to Correctional Officer Fink, the TAC alleges sufficient facts showing deliberate indifference. On August 25, 2015, Correctional Officer Fink was on duty in Cell Block J when Plaintiff was first attacked. (Doc. No. 33 at ¶ 16.) The TAC alleges that Correctional Officer Fink received notice of the threat to Plaintiff's safety "by way of the warning and administrative recommendation delivered from SCI Huntingdon." (Doc. No. 36 at 6.) This warning noted that Plaintiff should be placed at "custody level 5," which is reserved for

8

inmates who should be removed from the general jail population and placed in separate housing. (Doc. No. 33 at ¶ 9.) Correctional Officer Fink, along with other prison officials, received the administrative recommendation from SCI Huntingdon, yet "proceeded to ignore it to Plaintiff's detriment." (Doc. No. 36 at 6.) When Plaintiff arrived on Cell Block J, Correctional Officer Fink did not immediately notice Plaintiff. (Doc. No. 33 at ¶ 16.) While Plaintiff was waiting for Correctional Officer Fink to open his jail cell door, he was assaulted by Alequin. (Id.) The TAC alleges that it took Correctional Officer Fink several minutes to respond to the altercation. (Id.) Viewing these facts in the light most favorable to Plaintiff, the TAC plausibly states that Correctional Officer Fink acted with deliberate indifference. The Section 1983 failure to protect claim against Correctional Officer Fink, therefore, will not be dismissed.

Turning to Correctional Officer Riegner, the TAC states plausible facts showing deliberate indifference. Like Fink, Correctional Officer Riegner is alleged to have received notice of the threat to Plaintiff's safety by way of the warning from SCI Huntingdon, recommending that Plaintiff be housed separately from the general jail population. (Doc. No. 36 at 6.) In addition to this notice, Correctional Officer Riegner was on notice of the threat to Plaintiff's safety through the first assault. Plaintiff wrote several grievances about the assault, informing prison officials that Alequin was a family member of the victim of the crime for which Plaintiff was on trial. (Doc. No. 33 at Exs. B-G, I, K.) Correctional Officer Riegner was also made aware of this fact when Plaintiff was transferred from solitary confinement back to the general jail population, less than 24 hours before he was assaulted for a second time. On September 9, 2015, Correctional Officer Riegner was responsible for guarding the cell block where Plaintiff was located. (Id. at ¶ 20.) During the second assault on Plaintiff, however, Correctional Officer Riegner was distracted by other inmates entering the cell block from the

9

exercise yard. (Id.) It was only after another correctional officer walked onto the cell block that Correctional Officer Riegner was made aware of the ongoing attack on Plaintiff. (Id.) This was the second time in three weeks that Plaintiff was attacked by a family member of his alleged victim. (Id. at Ex. J.) These facts, viewed in the light most favorable to Plaintiff, show deliberate indifference on the part of Correctional Officer Riegner.

Concluding with Captain Torres, the TAC also alleges facts showing his deliberate indifference. Captain Torres was "the officer in charge" of correctional officers at Berks County Jail. (Id. at ¶ 17.) Similar to Correctional Officers Fink and Riegner, Captain Torres received notice from SCI Huntingdon that Plaintiff should be housed separately from the general jail population. (Doc. No. 36 at 6.) Plaintiff, however, was placed in the general jail population. On August 25, 2015, Plaintiff was assaulted by a family member of the victim of the crime for which he was on trial. (Doc. No. 33 at ¶ 16.) Plaintiff repeatedly requested to speak with Captain Torres after the first assault, but these requests "went unanswered." (Id. at ¶ 17.) He wrote several grievances to prison officials informing them that family members of his victim were housed at Berks County Jail and requested transfer back to SCI Huntingdon for his safety. (Id. at Exs. B-G, I, K.) Instead of transferring Plaintiff to SCI Huntingdon or placing him in separate housing, prison officials removed Plaintiff from solitary confinement and returned him to the general population. (Id. at ¶ 20.) Like Correctional Officer Riegner, Captain Torres was put on notice more than twice "of the need to house Plaintiff in a single-occupancy cell away from the general jail population . . . by the information sheet received on August 14, 2015 from SCI Huntingdon, and again by the August 25, 2015 attack on Plaintiff." (Id. at ¶ 24.) Captain Torres did respond to Plaintiff's grievances after the second assault. (Id. at Ex. J.) He wrote that "[w]e were certainly not aware that Valentin[-Quinones] was related to the alleged victim of your

10

crime." (Id.)  However, this statement, taken alone, does not show that Moving Defendants were unaware of the threat to Plaintiff's safety.  Viewing the facts in the light most favorable to Plaintiff, this Court concludes that the TAC alleges plausible facts showing deliberate indifference as to all Moving Defendants.  Therefore, Plaintiff's Section 1983 failure to protect claim asserted in Count I will not be dismissed.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (Doc. No. 35) will be denied. An appropriate Order follows.